# AFFIDAVIT IN SUPPORT OF APPLICATION FOR
# CRIMINAL COMPLAINT AND ARREST WARRANT

I, Brandon Amerine, being duly sworn, hereby depose and state the following:

## INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since May 2019. I am currently assigned to the Boston Field Office, North Shore Gang Task Force ("NSGTF"). The primary mission of the NSGTF is to identify, investigate, disrupt, and dismantle violent criminal organizations operating in communities north of Boston. My responsibilities include the investigation of possible violations of federal law, including illegal possession of firearms, firearms trafficking, narcotics trafficking, and violent crimes involving firearms and narcotics trafficking.

## PURPOSE OF AFFIDAVIT

2. The FBI Boston NSGTF is investigating members and associates of the transnational criminal organization 18th Street Gang ("18SG"), operating in and around the north shore area of Boston including Everett, Chelsea, Revere, East Boston, and Lynn. From this investigation, I am familiar with an 18SG associate, Melbi Ovidio ORTEZ (YOB 1984). ORTEZ and other 18SG members and associates are suspected of engaging in a range of criminal activity, including firearms offenses and narcotics and weapons trafficking offenses.

3. I submit this affidavit in support of an application for an arrest warrant and criminal complaint, charging ORTEZ with Engaging in the Business of Dealing in Firearms Without a License, in violation of 18 U.S.C. § 922(a)(1)(A), for illegally selling four firearms between April 3, 2025 and May 2, 2025, in Chelsea, Massachusetts.

4. The facts stated herein are based on my own personal involvement with this investigation as well as from information provided to me by other law enforcement officers

involved in the investigation. Because this affidavit is submitted for the limited purpose of securing authorization for the requested complaint and warrant, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish probable cause in support of a criminal complaint and the issuance of an arrest warrant. All times referenced herein are approximate.

## PROBABLE CAUSE

5. A cooperating witness ("CW-3") working with the FBI made a series of controlled purchases of firearms from ORTEZ.[1] CW-3 coordinated each one of the transactions in voice calls with ORTEZ using phone number 617-306-4674. I know from my review of records from AT&T that cellular service for phone number 617-306-4674 was registered with an active subscriber using the address "80 Grove Street, Apt 2, Chelsea, MA 02150." As set forth herein, 80 Grove Street, Apartment 2 in Chelsea was the same location where each deal occurred, and I believe it is the address where ORTEZ was residing at the time.

6. Prior to each controlled purchase of firearms and/or controlled substances from ORTEZ, members of the NSGTF followed the same procedures. They met CW-3 at a predetermined location, searched CW-3 for money or contraband with negative results, equipped CW-3 with an audio- and video-recording device, and provided CW-3 with the cash necessary for the planned deals. They then instructed CW-3 to make the controlled purchase and surveilled CW-3 during and after the purchase. Following the operations, members of the NSGTF

---

[1] CW-3 is the only cooperating witness referenced in this affidavit, but the investigation has involved multiple FBI cooperating witnesses, each assigned sequential numbers. For the sake of consistency between reports and affidavits that have been authored in this investigation, I refer to CW-3 herein using their assigned number. CW-3 has previously provided information to law enforcement in this investigation and has received $12,400 in financial compensation to date, in exchange for their assistance to law enforcement. Information provided by CW-3 has proven to be reliable, and their information has been corroborated to the extent possible by surveillance observations, preserved recordings, and records of electronic communications. CW-3 has a criminal history that includes convictions for Assault and Battery on a Household Member, and Assault with a Deadly Weapon.

followed CW-3 back to the predetermined meeting location, where they again searched CW-3 for money or contraband with negative results, and they retrieved the recording device and evidence.

7.  The narrations of events are based upon a combination of surveillance observations by myself and members of the NSGTF, my review of the audio/video recordings generated by CW-3 during the operations, and my debriefings of CW-3 following the meetings with ORTEZ.

### April 3, 2025 Controlled Purchase of Glock 43X from ORTEZ

8.  On April 3, 2025, at the direction of the FBI Boston NSGTF, CW-3 conducted a controlled purchase of a Glock 43X pistol from ORTEZ for $1,600.

9.  Beginning at 5:00 p.m., CW-3 walked up 5th Street towards Bellingham Square and then walked up Grove Street towards 80 Grove Street in Chelsea. At 5:08 p.m., CW-3 met ORTEZ at 80 Grove Street and walked with him to the rear of the location. ORTEZ was wearing a gray hooded sweatshirt with hood up, gray sweatpants, black and white Adidas sneakers, and a black shoulder bag slung over his right shoulder. ORTEZ removed the shoulder bag and unzipped it. At 5:09 p.m., CW-3 handed ORTEZ the cash provided by the FBI, and ORTEZ counted it in CW-3's presence. ORTEZ put the money into his pants pocket and then provided CW-3 with a firearm and magazine. Next, they next discussed prices for cocaine. ORTEZ instructed CW-3 to keep their voice down. At 5:11 p.m., CW-3 and ORTEZ departed the location and parted ways.

10. CW-3 returned directly to a predetermined location where they met NSGTF personnel and relinquished the recording device and the firearms evidence. Members of the

NSGTF seized a Glock 43X 9mm caliber semiautomatic pistol with an obliterated serial number, two magazines, and 10 rounds of 9mm ammunition.

### April 10, 2025 Controlled Purchase of 56 Grams of Cocaine from ORTEZ

11.     On April 10, 2025, at the direction of the FBI Boston NSGTF, CW-3 made a controlled purchase of approximately 58.5 grams of suspected cocaine from ORTEZ for $2,500. In addition, CW-3 was instructed to inquire about purchasing a second firearm from ORTEZ.

12.     At 11:06 a.m., CW-3 called an Uber to 179 Essex Street in Boston where they planned to meet ORTEZ. At 11:27 a.m., CW-3 arrived and exited the Uber. ORTEZ was waiting at the location as planned. At 11:32 a.m., CW-3 and ORTEZ entered another Uber, and they drove in the direction of Chelsea. The Uber stopped in front of 80 Grove Street at 11:46 a.m., and CW-3 and ORTEZ exited together. They walked down the left side of the property towards the rear. CW-3 remained outside while ORTEZ entered the 80 Grove Street. At 11:49 a.m., ORTEZ returned and gave CW-3 a clear plastic baggy, knotted at the top, containing a white powdery substance. CW-3 handed ORTEZ the cash provided by the FBI. The conversation then turned to a second firearm deal. ORTEZ stated, in sum and substance, that he may be able to get CW-3 a revolver in the near future. CW-3 departed at 11:54 a.m.

13.     CW-3 returned directly to a predetermined location where they met NSGTF personnel and relinquished the recording device and the drug evidence. Members of the NSGTF seized the white powdery substance. It weighed approximately 58.5 grams and was field tested utilizing a ThermoScientific TruNarc device, testing positive for Cocaine Hydrocholoride.

### April 15, 2025 Controlled Purchase of .22 Revolver and Ammunition from ORTEZ

14.     On April 15, 2025, at the direction of the FBI Boston NSGTF, CW-3 made a controlled purchase of a .22 caliber revolver and ammunition for $1,200.

15. Beginning at 4:44 p.m., CW-3 walked from the predetermined meeting location towards 80 Grove Street in Chelsea. At 4:53 p.m., CW-3 arrived and proceeded to the rear of the building. At 4:54 p.m., ORTEZ exited 80 Grove Street and met CW-3. ORTEZ was wearing dark colored Adidas sneakers, khaki pants, dark colored jacket with yellow emblem on left chest, a dark blue New England Patriots flat brimmed hat, and a gold bracelet around his right wrist. He removed a dark backpack from his shoulder, unzipped it, and placed dark construction gloves on his hands before he withdrew the firearm. From the backpack, ORTEZ removed a revolver in a dark holster and a box of ammunition, and he handed the items to CW-3. CW-3 then gave ORTEZ the cash provided by the FBI. ORTEZ counted the cash in CW-3's presence.

16. At 4:55 p.m., ORTEZ and CW-3 parted ways. ORTEZ went back inside 80 Grove Street while CW-3 returned directly to a predetermined location where they met NSGTF personnel and relinquished the recording device and the firearms evidence. Members of the NSGTF seized a Sturm & Ruger "Bearcat" .22 caliber revolver, bearing serial number 113595, with six rounds of .22LR caliber ammunition in the cylinder, a brown holster, and a box containing an additional 88 .22LR rounds of ammunition.

**April 22, 2025 Controlled Purchase of Glock .40 and 28 Grams of Cocaine from ORTEZ**

17. On April 22, 2025, at the direction of the FBI Boston NSGTF, CW-3 made a controlled purchase of a Glock .40 caliber pistol and ammunition and approximately 29.5 grams of suspected cocaine from ORTEZ, for $3,000.

18. At 4:32 p.m., CW-3 began walking on Grove Street in Chelsea in the direction of 80 Grove Street. They arrived at 4:35 p.m. and proceeded to the rear of the building, where they met ORTEZ. CW-3 retrieved the cash provided by the FBI and handed it to ORTEZ. ORTEZ

counted the cash in the presence of CW-3. He then gave CW-3 a firearm and a white powdery substance in a clear plastic bag.

19. CW-3 departed 80 Grove Street and returned directly to a predetermined location where they met NSGTF personnel and relinquished the recording device and the firearms and drug evidence. Members of the NSGTF seized a Glock 22 Gen 4, .40 caliber semiautomatic pistol, bearing serial number RMZ735, and a 15-round magazine fully loaded with .40 caliber ammunition. They also seized the clear plastic bag containing the white powdery substance. It weighed approximately 29.5 grams and was field tested utilizing a ThermoScientific TruNarc device, testing positive for Cocaine Hydrocholoride

### May 2, 2025 Controlled Purchase of Colt .380 Handgun from ORTEZ

20. On May 2, 2025, at the direction of the FBI Boston NSGTF, CW-3 made a controlled purchase of a Colt .380 caliber pistol and ammunition from ORTEZ, for $1,200.

21. Beginning at 4:25 p.m., CW-3 walked towards 80 Gove Street in Chelsea from a pre-determined meeting location. At 4:28 p.m., CW-3 and ORTEZ spoke in a telephone call. At 4:34 p.m., CW-3 arrived at 80 Grove Street and proceeded to the rear of the building. CW-3 and ORTEZ greeted each other there. ORTEZ was wearing dark Adidas sneakers with white stripes, blue jeans, dark hoodie sweatshirt, a dark blue New England Patriots flat-brimmed hat, and black-and-gray work gloves. CW-3 handed ORTEZ the cash provided by the FBI, and ORTEZ removed his gloves to count it. ORTEZ then put the gloves back on his hands and pulled a black holster containing a silver handgun from his right jeans pocket. ORTEZ removed the handgun from the holster and showed the firearm to CW-3. ORTEZ then, in sum and substance, explained to CW-3 how to use the firearm and assured them that it functioned well.

22.     ORTEZ and CW-3 continued to converse. ORTEZ advised, in sum and substance, that he had another firearm for sale that resembled the Glock he had sold to CW-3 previously. ORTEZ indicated that the firearm had cost him $2,000. ORTEZ then re-entered 80 Grove Street. Moments later, he returned with a firearm and showed it to CW-3. ORTEZ then stated, in sum and substance, that he couldn't sell it for any amount less than $2,000 because that is the price he paid for it. ORTEZ also stated, in sum and substance, that he would keep the firearm if he couldn't sell it, because it was brand new.

23.     At 4:46 p.m., CW-3 departed 80 Grove Street and returned directly to a predetermined location where they met NSGTF personnel and relinquished the recording device and the firearms evidence. Members of the NSGTF seized a Colt .380 caliber hammerless pistol with an obliterated serial number and a magazine loaded with seven rounds of .380 caliber ammunition. Additionally, ORTEZ had provided CW-3 with the black holster, and a box containing an additional 44 rounds of .380 caliber ammunition.

**Firearms and Records Checks**

24.     I have shared information about the firearms sold by ORTEZ with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), including the serial numbers. ATF maintains a national database of firearms transactions in the National Tracing Center ("NTC"), including those firearms reported as part of multiple handgun sales by authorized firearms dealers. I have reviewed the "Firearms Trace Reports" generated by the NTC for the firearms sold by ORTEZ. Examinations of the firearms and ATF reports revealed the following information:

  a. The serial number on the Glock 43X 9mm caliber semiautomatic pistol was obliterated. However, using the frame number, 1666320144, ATF was able to

identify the serial number, CBBR292. A trace of this serial number indicated that the firearm was sold in Merrimack, New Hampshire on April 3, 2025. The "Time to Crime" (TTC) was 20 days. Based on my training and experience, I recognize that 20 days is an extremely short TTC. I also know that it is unusual for a firearm's serial number to be obliterated within 20 days of a reported sale. These facts are strongly indicative of illegal firearms trafficking.

b. The Sturm and Ruger "Bearcat" .22 caliber revolver, bearing serial number 113595, was shipped to a licensed dealer in Manchester, New Hampshire in 1969. The dealer is now out of business, and there are no records of transactions after that date.

c. The Glock 22 Gen 4, .40 caliber semiautomatic pistol, bearing serial number RMZ735, was sold in Collinsville, Virginia on November 28, 2022.

d. The Colt .380 caliber hammerless semiautomatic pistol had an obliterated serial number and could not be identified in any other manner. Accordingly, no transaction records could be found, and no trace report was generated.

25. I have also sent case reports and photographs of the firearms to ATF Special Agent Mariah Kini, who has specialized training and experience relating to the identification, origin, and classification of firearms and ammunition under the provisions of federal firearms laws. Special Agent Kini informed me that based upon her review of the photographs of the firearms and her knowledge of the case, it is her opinion that each one of the firearms sold by ORTEZ meets the definition of a "firearm" in Title 18 U.S.C. § 921. Special Agent Kini further informed me that based upon her training and experience and the markings on the firearms, it is her opinion that each one of the firearms traveled in or affected interstate commerce.

Specifically, Glock pistols are manufactured in Austria and imported to the United States, and both the Sturm and Ruger "Bearcat" .22 caliber revolver and the Colt .380 caliber hammerless semiautomatic pistol were likely manufactured in Connecticut and necessarily crossed state lines into Massachusetts before they were sold by ORTEZ.

26. Finally, I have conducted law enforcement database checks utilizing ORTEZ's biographical data for firearms licensing records in Massachusetts. There were no results. Therefore, I do not believe that ORTEZ has ever obtained a License to Carry a firearm or a Firearms Identification Card issued by the Commonwealth of Massachusetts.

27. ATF also maintains a national database of Federal Firearms Licensees ("FFL"), *i.e.*, license issued to person or entities authorized to engage in the business of dealing in firearms. The database is called the Firearms Licensing System. Among other information, the Firearms Licensing System tracks applications and licenses granted to FFLs. Special Agent Kini informed me that she conducted an inquiry of the Firearms Licensing System using ORTEZ's biographical information. The queries returned no results, indicating that ORTEZ has never applied for an FFL, has never possessed an FFL, and was not authorized under federal law, at any time, to engage in the business of dealing in firearms.

[continued on next page]

## CONCLUSION

28.     Based on all the foregoing information and upon my training and experience, there is probable cause to believe that between April 3, 2025 and May 2, 2025, in Chelsea, in the District of Massachusetts, ORTEZ unlawfully engaged in the business of dealing in firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A).  Accordingly, I request that the Court issue the attached criminal complaint and arrest warrant for ORTEZ.

Respectfully submitted,

/s/ Brandon Amerine
_____
Brandon Amerine
Special Agent
Federal Bureau of Investigation



Signed electronically and sworn to by teleconference in accordance with Federal Rule of Criminal Procedure 4.1 this _____ day of June, 2025.

June 5

_____
HONORABLE M. PAGE KELLEY
United States Magistrate Judge

10